**CINCINNATI (City), Plaintiff, v. WALTON, Defendant.**

Cincinnati Municipal Court, Hamilton County.

Nos. 77288, 77289. Decided July 25, 1957.

Lyle W. Castle, for the City of Cincinnati.
William F. Hopkins, for the defendant.

**OPINION**

By BETTMAN, J.

This is a criminal action in which the defendant is charged with a violation of Sec. 901-I3 of the Code of Ordinances of the City of Cincinnati. This section provides:   .

"Whoever shall print, engrave, sell, offer for sale, give away, exhibit or publish, or exhibit as for sale or other purpose, or have in his possession or under his control, any obscene, lewd, lascivious, indecedent, or immodest book, pamphlet, paper, picture, image, cast, statuary, drawing or representation, or any other article of an indecent or immoral nature, or book, paper, print, circular or writing made up principally of pictures or stories of immodest deeds, lust or crime, or shall exhibit upon the public street or highway, any of the articles or papers, prints, publications, as aforesaid, within the view of passersby upon said street or highway, shall be fined not more than one hundred ($100.00) dollars, or imprisoned not more than sixty (60) days, or both."

The matter was heard by the Court sitting as both judge and jury, the defendant having waived her right to trial by jury. At the trial it was stipulated by the parties that on or about October 19, 1956 the police entered a certain store on Eighth Street in the City of Cincinnati; that defendant was in charge of said store; that the magazines, pictures, and other items in evidence were located in said store and were offered for sale to the general public.

Counsel for defendant and for the prosecution agreed in open court that the sole question before the Court was whether the material received in evidence was "obscene."

**Juveniles**

At the trial the prosecution offered evidence that the store in question was located between two schools and that a number of minors were in and around the store. This evidence was admitted. The Court also permitted two psychologists and a psychiatrist, expert witnesses on behalf of the prosecution, to give their opinions as to the effect of the material in evidence on minors. The prosecution further appended to its brief a copy of the Interim Report of the Senate Judiciary Committee relative to "Obscene and Pornographic Literature and Juvenile Delinquency" and argued in its brief that the effect of material presented in evidence on minors should be taken into consideration.

To the extent that evidence was admitted pertaining to the effect of the magazines, pictures, and contraceptives, admitted in evidence. on minors, the Court must consider such evidence stricken from the record and must consider the argument offered by the prosecution in that respect not relevant to the issue.

The Supreme Court of the United States in the recent case of Butler

v. Michigan, 352 U. S. 380 (1957), in holding void a Michigan statute, making it a criminal offense to sell a book having a potentially deleterious influence on youth, as in violation of the due process clause of the 14th Amendment, stated at page 383:

"The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society."

The Supreme Court has therefore made it clear that a decision that matter is obscene based on evidence of its effect upon minors would be in violation of the 14th Amendment. This Court is bound to construe the Ordinance in a manner which will make it constitutional, if such construction is possible, and cannot, therefore, in determining the meaning of the word "obscene" use a test which includes the effect of the material on minors.

Many valued and sincere citizens of this community have evinced a serious interest in this matter because of their real concern for youth. The above cited decision, together with the compelling logic of the proposition that they do not wish to restrict their own reading to what is suitable for children, any more than they wish to restrict their diet to baby food, must convince them that the general obscenity laws are not the answer to the problem with which they seek to deal.

This court is convinced of the tremendous importance of protecting youth from the serious effects of much that is thrust at them today. Many young people lack the parental guidance and constructive influences necessary to develop their capacity to choose good from evil. In a recent editorial in the American Journal of Psychotherapy (Volume XI No. 2 April, 1957) entitled "Psychiatry and Censorship," Dr. Fredric Wertham made these points:

"First, * * * a sharp distinction must be made between children and adults. Secondly, the modern development of mass media has so increased the quantity of material that a new psychologic situation has arisen. * * * Thirdly, as far as the problem of harmful effects on the individual is concerned, it is not a question of sex alone, but of the endless stream of violence, crime, brutality, torture, cruelty and sadism."

When this court served in the Ohio Legislature in 1955 he co-authored legislation which became §2903.10 R. C. placing severe penalties on sales to children under eighteen of magazines depicting seduction or incest or which were provocative of corrupt morals, crime, or juvenile delinquency. Sec. 2905.34 R. C., provides that:

"No person shall * * * sell, give away, or show to a minor, a book, pamphlet, or magazine * * * devoted to the publication of * * * accounts of criminal deeds, or pictures or stories of immoral deeds, lust, or crime * * *"

These two sections were designed to meet the problem with which we are all concerned. It may be that other legislation locally or on a state basis is necessary. But, as Justice Frankfurter said in the Butler

case, the legislation must be reasonably restricted to the evil with which it is said to deal. We must not, he said, "burn the house to roast the pig." Dr. Wertham, a national authority on juvenile psychology, says:

"If censorship must be considered at all, it should be viewed judiciously and constructively, for the protection of children, and not for the harrassment of adults whose pattern of life is set."

A conscientious study of the principles involved and the decisions convinces the Court that only by laws dealing specifically with minors can we protect our children, without running afoul of the fundamental constitutional prohibitions against laws restricting freedom of the press.

### Ohio Law on Obscenity

There is a paucity of cases and no Supreme Court or Appellate Court decision in Ohio dealing with the meaning of the word obscene. **State v. Zurhorst, 75 Oh St 232 (1906)**, held simply that it was not necessary to attach a copy of the alleged obscene matter to the affidavit. Goode v. State, 17 O. C. C. (N. S.) 195 (1910), a decision by the Cuyahoga Circuit Court, supplies no positive test and was decided long before the great number of carefully thought out decisions of other courts including the Supreme Court of the United States.

Judge Stanley Struble of our own Court of Common Pleas in **State v. Lerner, 51 Abs 321 (1948)**, held that the test of obscenity is

"the moral concept of the people as a whole, community concept of what is obscenity in literature * * *."

With sincere respect for the distinguished Judge and concurring with the result he reached, this is no test at all. It merely says "the matter is obscene if you think most people would think it obscene."

There being no Ohio Law binding on this Court, the Court must perforce find its own standard. That this is no easy task is made obvious by the comprehensive study of the problem entitled "Literature, The Law of Obscenity, and The Constitution" by Professors Lockhart & McClure of the University of Minnesota in 38 Minn. L. R. 295. They conclude that there is no perfect definition of obscenity. However, as the article points out, courts have no choice but to do the best they can with an extremely difficult and complex concept.

### Constitutional Requirements of a Test of Obscenity

In fixing its standard the Court must first be guided by the words of the Supreme Court of the United States in Roth v. United States decided June 24, 1957. Justice Brennan, writing the majority opinion, said:

"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests. It is therefore vital that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest."

Thus any construction of a standard of obscenity must start out in the light of the fundamental principle enunciated in our Ohio and Federal Constitutions that

"no law shall be passed to restrain liberty of speech and of the press."

That such a principle is basic to our American system, despite its unpleasant by-products, was well understood by the men who placed it in our Constitution. President Madison is quoted by Chief Justice Hughes in Near v. Minnesota, 283 U. S. 697, 718 (1931), as saying:

"It has accordingly been decided by the practice of the states, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits. And can the wisdom of this policy be doubted by any who reflect that to the press alone, chequered as it is with abuses, the world is indebted for all the triumphs which have been gained by reason and humanity over error and oppression;"

Again quoting Justice Brennan in the Roth case.

"All ideas having even the slightest redeeming social importance— unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests."

Secondly, in order to satisfy the constitutional requirement of due process of law a proper standard for judging obscenity, said Justice Brennan, must

"give adequate warning of the conduct proscribed and mark boundaries sufficiently distinct for judges and juries fairly to administer the law."

### Test of Obscenity

From the above the court has concluded that to be obscene the material must first of all be calculated to appeal to the reader's or viewer's prurient interest—that is to say, that it must be material which from a viewing or reading thereof one arrives clearly at the conclusion that the author or designer had one purpose, namely to sell his material by such an appeal. Only by applying this test can we protect "ideas having the slightest social importance." Only thus can we keep our door protecting the full interchange of ideas "tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests."

That the matter must be calculated to produce the result has been used as a test by many courts. In his logically thought out and detailed opinion in Commonwealth v. Gordon, 66 PA. D. & C. Rep. 101, at page 151, Judge Bok said:

"Sexual impurity in literature (pornography, as some of the cases call it) I define as any writing whose dominant **purpose** and effect is erotic allurement—that is to say, a **calculated** and effective incitement to sexual desire." (Emphasis mine.)

In other words, unless it is apparent that the material is "dirt for dirt's sake" it cannot constitutionally be found obscene. It has been the

failure of some courts to observe this principle that has encouraged the Anthony Comstocks of the world to shake their censor's scissors at any book which even mentioned sex and indeed in Massachusetts even brought on the banning of Theodore Dreiser's "An American Tragedy."

Some courts attempt to weight the literary, educational, artistic or scientific values of the material against the amount of sex in it. Although in many cases this appears to produce a correct result it cannot but lead to a morass of vagueness which does not "mark boundaries sufficiently distinct for judges and juries fairly to administer the law." How can one say how much literary merit will outweigh X amount of sex? If the material has a sincere not a prurient purpose it is not obscene, regardless of the subject matter with which it deals.

Requiring that to be obscene matter must be calculated to appeal to man's prurient interest will, I believe, keep the courts out of many of the pitfalls into which they have fallen in the past. That it is a necessary element of a constitutional standard of obscenity is the entire thrust of Chief Justice Warren's concurring opinion in the Roth case. He pointed out that:

"In his charge to the jury, the district judge stated that the matter must be 'calculated' to corrupt or debauch. The defendants in both these cases were engaged in the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers. They were plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect. I believe that the State and Federal Governments can constitutionally punish such conduct. That is all that these cases present to us, and that is all we need to decide."

Once having determined that the material is calculated to appeal to a prurient interest we then come to the second test. This is that the material must have a substantial tendency to excite lustful desires or be material dealing with sexual perversion. It must, as Judge Bok says, be not only "calculated" but also "effective." I have gone over carefully the standards used in numerous decisions cited by the prosecution and by counsel for the defense and believe that the above standard most clearly encompasses what the obscenity laws are seeking to eliminate.

That the material acts as an aphrodisiac can almost be determined physically. Although it must be tested by its effect on a person with average sex instincts, a judge or juror should be able to estimate that rather closely by the reaction he himself has to the material. Such a test is not subjective in the sense of a value judgment but analogous to a determination of whether or not one is hungry. It is I believe as unambiguous and simple of application as any test which can be evolved. As to what constitutes a sexual perversion this Court is satisfied that the word has a clearly enough defined meaning so that any jury, aided by testimony of psychologists or psychiatrists would have little difficulty in making a decision.

### Factual Determinations

Having determined its double test of obscenity the Court now turns to the material which is in evidence. This material for purposes of dis-

cussion can be divided into several distinct groups:

1. Sets of snapshots of nude or semi-nude women in various more or less seductive or salacious poses, or so-called "art" magazines with the same type pictures. In all of these the pubic area is either averted or covered by shadow or some object or item of clothing.

2. Nudist magazines ("Sunshine & Health," "Sun Magazine," "Sunbathing" December, 1956 issues) containing pictures of nude men, women, and children individually or in groups. In most of these no attempt is made to cover the pubic area. None of the pictures is posed in any sexually suggestive manner. The script in these magazines is non-fiction and has nothing to do with sex.

3. So-called "men's magazines" ("Caper," "Gay Blade," "Night & Day," "Nugget," "Man," "Dude," "Escapade," "Mens Pictorial," December 1956 issues) and others more or less along the lines of "Esquire" but on the whole with less restraint in dealing with sex. These contain a variety of stories, pictures and jokes, many dealing with sex and others often with outdoor life, sports and other matter.

4. Magazines with stories and "letters to the editor" about chaining, spanking, men in women's clothes, and pictures of the same and of women in tight corsets, unusually high heels, or leather and rubber garments of various kinds.

5. A man's contraceptive of extraordinary size in an envelope marked "For the self-made man."

This being a criminal prosecution, in considering this evidence, the Court must, to find the defendant guilty as charged, find the material obscene beyond a reasonable doubt.

1. There is little doubt in my mind that the groups of snapshots and magazines of nudes are calculated to appeal to the viewer's prurient interest. The so-called photographic information and statements that they are for art students are patently dishonest. However, I cannot find that they have a substantial tendency to excite lustful desires in an adult of average sex instincts. A few—specifically "Gallery" No. 1; "Brandee Kayse" No. 8; "Pal-ette" No. 1; "Hold It" Vol. 2; "Vicki Palmer" No. 7;—because of the type of pose and angle of shooting, skate very close to the line, but one is certainly left with a reasonable doubt. A good deal of it is vulgar trash, and it is most certainly not for children, but it is not obscene.

2. The nudist magazines present a different problem. Though showing men and women completely nude, none is posed in a suggestive or salacious manner. The subjects are usually in outdoor surroundings and on the whole the photographs are much like anyone's snapshot album except for the lack of clothing.

Several cases have held that mere nudity in a picture is not obscenity. People v. Muller, 96 N. Y. 408; Parmalee v. United States, 113 F. 2d. 729; Sunshine Book Co. v. Summerfield, 128 F. Supp. 564 (1955). In the Sunshine Book case, Judge Kirkland held that pictures of nudes except pictures "taken at very close range of the pubic area" are not obscene. How close is "too close" the Judge does not explain. I do not believe these magazines were published to appeal to man's prurient interest nor, in a day and age when bathing suits are like handkerchieves

and virtual nudes stare down from every garage wall or advertisement, do I believe this group of magazines has a substantial tendency to excite lustful desires in an average person.

3. What I have loosely grouped together as "men's magazines" are more difficult to classify in terms of what the intent of the authors or publishers may be. Being magazines designed to amuse or delight the reader, without educational intent, the line between obscenity and permissible gayety or pleasure is rather fine.

The prosecution has contended in its brief that the generally accepted requirement that in judging obscenity a book must be viewed as a whole, does not apply to magazines where stories and pictures are not related to one another. In this the Court generally concurs. The "as a whole" test was built up by the courts to escape from the absurd result that was produced when one took, out of context, isolated passages from a sincere book. But where the parts are not specifically related—where, as here, you have a succession of pictures and stories, each conveying an individual message—each can be judged individually. The entire magazine should be examined to cast light on the publishers intent but an individual picture or story in a magazine not related to the whole can be tested by the principles hereinbefore set out, and can be found obscene.

Taking first the pictures in these magazines. Some are rather beautiful; others more ordinary; but none is posed in the suggestive or salacious way they are in the first group discussed. Furthermore, virtually all are more clad than those in group one. I could find none which I felt beyond a reasonable doubt either was calculated to appeal to a prurient interest or had a substantial tendency to excite lustful desires.

As for the stories and articles, many deal with or involve sex. It is appropriate therefore to quote Justice Grennan in the Roth case:

"However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest.

"The portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern."

The Court has read the stories in these various magazines and applied to each the tests of obscenity and finds "Rehearsal" and "Both Ends of the Candle" both in the November, 1956 issue of "Dude" obscene. The balance of the stories and magazines the Court finds not obscene.

4. The fourth group is composed of various issues of "Exotique" and "Eizarre." Their pictures, stories, and letters are designed to appeal to the sadist, the masochist, the homosexual, and the fetishist. The intent of the publisher is obviously to appeal to man's prurient interest and they deal with sexual perversion. The Court finds all issues of both magazines obscene.

5. The contraceptive in evidence might possibly be designed to

appeal to man's prurient interest. It certainly would have no substantial tendency to excite lustful desires. It is vulgar and crude, but it is not obscene.

The Court wishes to thank counsel for their carefully prepared briefs and for their restraint in the court room under difficult circumstances.

The Court having determined beyond a reasonable doubt that defendant had in her possession for purposes of sale an obscene pamphlet, in violation of Section 901-I3 of the Code of Ordinances of the City of Cincinnati, finds the defendant guilty as charged.